UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

LANCE CONWAY WOOD,

                Plaintiffs,

    v.

KEITH YORDY, STEVE NELSON,
MIKE LUDLOW, *et al.*,

                Defendants.

Case No. 1:07-cv-00350-EJL

**MEMORANDUM DECISION AND
ORDER**

Defendants' Motion for Summary Judgment, which was originally filed nearly two

years ago, on May 3, 2010 (Dkt. 78), was renewed by Defendants on January 23, 2012.

(Dkt. 94.) Plaintiff Lance Wood (Wood) earlier filed a Response (Dkt. 82) to the original

motion, and Defendants filed a Reply. (Dkt. 83.) The Court resolved a discovery dispute

after the Motion for Summary Judgment, and permitted the parties to renew their

summary judgment motions or file any supplemental briefing on the newly-disclosed

discovery items.(Dkt. 92.) Wood filed a Motion for Extension of Time, requesting

through February 28, 2012 to file his Response. While the Court will grant that Motion,

Wood failed to file a Response by that date, and Wood's Motion for Clarification, asking

what should be contained in the Response, will be denied as moot, because Wood failed

to file anything by the February 28, 2012 requested extension date. Further, additional briefing is unnecessary.

Defendants filed a Supplemental Notice of Compliance on February 27, 2012, stating that they had found a videorecording of the Mike Ludlow polygraph examination, and providing that to the Court in camera. (Dkt. 98.) The Court agrees that, because the videorecording contains personal information of a prison employee, it will not be provided to Wood. In addition, the polygraph does not contain anything material to the narrow issues at hand. The polygraph interview addresses the question of whether Correctional Officer Ludlow sent an e-mail to a female correctional officer to help Wood contact her or find out information about her, but whether or not Ludlow did send the e-mail is not material to the Court's decision. Neither has the outcome of the polygraph been considered by the Court.

Accordingly, the Court considers the Renewed Motion for Summary Judgment fully briefed. Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, in the interest of avoiding delay, the Court will decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

## PLAINTIFF'S CLAIMS

Wood's six remaining claims are (1) Eighth Amendment calculated harassment, (2) First Amendment free exercise of religion, (3) RLUIPA, (4) Fourteenth Amendment equal protection, (5) First Amendment retaliation, and (6) First/Fourteenth Amendment access to courts. Four factual circumstances underlie Wood's six remaining claims:

1.   Defendants Keith Yordy and Steve Nelson issued a written memorandum to Wood on May 11, 2006, Defendants temporarily suspended Wood from his work assignments in the prison chapel and in the Life Transitions Program due to the staff investigation of Chaplain Les Petersen;[1]

2.   Defendant Yordy issued a May18, 2006 memorandum attempting to clarify that the May 11, 2006 memorandum did not bar Wood from attending religious services, but rather only temporarily suspended him from work assignments;

3.   Defendant Keith Yordy, Defendant Steve Nelson, and Chaplain Cosmo Zimik issue a third memorandum of February 1, 2007, to Wood, allegedly barring Wood from practicing his religion for six months (Dkt. 57-2, pp. 5-6);

4.   On February 24, 2007, Defendant Ludlow set up Wood and retaliated against him by planting a Kleenex containing prescription medication in a

_____

[1] Les Petersen's name is spelled with an "o"or an "e" in several places in the record, but his personnel records indicate the correct spelling is with an "e."

**MEMORANDUM DECISION AND ORDER - 3**

windowsill and then wrongfully attributing that to Wood and charging him

with a Disciplinary Offense Report. (Dkt. 77, p. 10.)

## STANDARD OF LAW GOVERNING
## SUMMARY JUDGMENT

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment rule "is to isolate and dispose of factually unsupported claims or

defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored

procedural shortcut," but is instead the "principal tool[] by which factually insufficient

claims or defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the

suit." *Id.* at 248.

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

(en banc). To carry this burden, the moving party may "cit[e] to particular parts of

materials in the record," show that "the materials cited do not establish the . . . presence

of a genuine dispute, or show that the "adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Anderson*, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show "by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324 (internal quotation marks omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion

and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Moreover, the Court may enter summary judgment in favor of a non-moving party, provided the other party is given "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f).

## BACKGROUND

This lawsuit and the related lawsuit that preceded it, *Wood v. Beauclair, Director of Prisons, et al.*, 3:04-cv-00099-WBS,[2] arise from allegations that numerous Idaho Department of Correction (IDOC) staff members have disregarded prison policies and formed a personal relationship with an inmate, Plaintiff Lance Wood. Such prohibited personal relationships breed inmate-staff problems, inmate-inmate problems, staff-staff problems, and staff-management problems. Such relationships also compromise prison security. However, as disappointing to the public trust as these personal relationships might be, the Constitution generally is not concerned with such issues.

Rather, the Constitution is concerned with protecting the *civil rights* of individuals, including inmates incarcerated by the State, who are no longer free to choose their circumstances. The Constitution requires that living conditions at the prisons be humane and safe. However, the United States Supreme Court has reiterated that the Eighth Amendment's Cruel and Unusual Punishment Clause should be reserved for "sufficiently

---

[2] The Court takes judicial notice of the pleadings, papers, and exhibits in this predecessor case.

serious"[3] incidents causing "unnecessary and wanton infliction of pain," where such pain has been inflicted by prison officials' "deliberate indifference to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 737-38 (2002) (internal citations and punctuation omitted). Further, in *McKune v. Lile*, 536 U.S. 24, 41 (2002), the United States Supreme Court observed that, in determining whether a constitutional claim lies, "[c]ourts must decide whether the [facts] are closer to the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not."

Inmates have limited free speech and free exercise of religion rights. *See Aiken v. Nixon*, 236 F.Supp.2d 211, 233 (N.D.N.Y. 2002) (observing that institutionalized persons do not "check their constitutional rights at the door."). Challenges to prison restrictions that are alleged "to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125 (1977) (citation omitted).

With these principles in mind, the Court reviews the chronological background of this case, because each of the four remaining incidents complained of occurred within a larger context that is relevant to the balancing of Wood's interests with prison interests. This chronology includes facts that are undisputed and material to the resolution of the issues in this case, as well as undisputed facts that are important to the background, but

---

[3] *See Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991).

immaterial to the narrow issues in the determination of summary judgment. Some of the

facts included are "allegations," meaning that the underlying fact is not necessarily true

and may be disputed, but that the allegation itself actually was made and played a role in

the actions of those involved.

| | |
|---|---|
| July 31, 2003 | While housed at the Idaho Correctional Center - Orofino (ICIO),Wood alleged he had a romantic relationship with Correctional Officer Sandra Taylor-Martin. Wood reported to prison officials that, when he informed her that he wished to discontinue the relationship, she began to harass and abuse him. As a result of the report, Wood was transferred to Idaho State Correctional Institution (ISCI). (Defendants' In Camera Exhibits A0001.pdf.) |
| 2003 | Deputy Warden Keith Yordy completed an investigation on the allegations that Wood was having a suspected inappropriate relationship with Officer Sandra Taylor-Martin. The investigation concluded that the allegations were unsubstantiated. (Defendants' In Camera Exhibits B0001.pdf.) During the course of the investigation, Inmate A[4] alleged that Wood was "out to get" Officer Taylor-Martin. (Defendants' In Camera Exhibits A0001.pdf.) |
| | During the investigation into Sandra Taylor-Martin and Wood, Yordy became aware that there was a possible inappropriate relationship between Officer Cheryl Davis and Wood at ICIO. Officer Davis received a letter of reprimand for the boundary issues identified in the investigation, but Davis never admitted to the alleged relationship. (Defendants' In Camera Exhibits B0001.pdf.) |
| Feb. 27, 2004 | Wood filed a civil rights lawsuit against Officer Taylor-Martin and other IDOC officials, including Keith Yordy, a defendant in the instant case, as well. During the course of this case, Wood admitted in deposition that "there was a fine line between officers and inmate relationships," and that he had "been across those lines before." (Case No. 3:04-cv-00099-WBS, Dkt. 279-6, Wood Depo. I, p. 14.) |

---

[4] Other inmates are referred to anonymously in this Order for security reasons, but their names are included in the reports submitted in camera.

This statement referred to a past relationship with prison employee Susan Isaac, a kitchen supervisor at Idaho Maximum Security Institution (IMSI).When the relationship was discovered, Wood was transferred to ICIO, where he met Officers Taylor-Martin and Davis. (*Id.*, p. 28.) Wood also stated in deposition: "[H]ow we used to get our messages back and forth to each other were through pens. I would give one to an inmate and say, "Hey, give this to Taylor, she dropped it," or something vice versa, and that's how we got our messages back." (*Id.*, p. 144.) (Wood's civil rights case continued through March 18, 2010, when a jury rendered a verdict in favor of Defendants.) *See Wood v. Martin et al.*, Case No. 3:04-cv-00099-WBS (Dkts. 4, 362.) The case is on appeal.

1998-2006+ Les Petersen was the Religious Activities Coordinator and a chaplain at the Idaho State Correctional Institution (ISCI) and Wood's supervisor in Wood's paid position as chapel janitor or librarian. Petersen had worked for the IDOC for 8 1/2 years at the time of the incidents that underlie this lawsuit. (Defendants' In Camera Exhibits B0001.pdf.)

July 2005-2006+ Correctional Officer Mike Ludlow worked at a security post in the Medical Unit where Wood came to pill call and where Wood worked as a Life Transition Program volunteer. He had been employed for about nine months and had just finished his employee probationary period when he was investigated for inappropriate interactions with Wood and Cheryl Davis (explained below). (Defendants' In Camera Exhibits B0001.pdf.)

2005 - 2006 Wood worked with Chaplain Petersen in the chapel for about a year, the first six months as a volunteer and the next six months as a paid janitor and librarian. Petersen had personal conversations with Wood about once a week. (Defendants' In Camera Exhibits B0001.pdf.) Petersen said Wood told him (1) Officer Cheryl Davis was meant to be his wife in eternity, according to his LDS beliefs, and that (2) Wood and Davis were "intimate" but had not had sex while Wood was housed in Orofino. (Defendants' In Camera Exhibits B0001.pdf.)

March 16, 2006, Les Petersen sent a first email to Officer Cheryl Davis. (Defendants' In Camera Exhibits B0001.pdf.)

| | |
|---|---|
| March 20, 2006 | Les Petersen sent a second email to Davis. (Defendants' In Camera Exhibits B0001.pdf.) |
| March 22, 2006 | Les Petersen sent a third email to Davis. (Defendants' In Camera Exhibits B0001.pdf.) |
| March 25, 2006 | Wood was awakened in his cell at midnight by Tim Higgins, a prison investigator, who was specifically looking for evidence of a relationship with Cheryl Davis, at the request of Keith Yordy. Higgins found nothing, apologized to Wood, and informed him that nothing was confiscated. (Defendants' In Camera Exhibits B0001.pdf.) |
| April 2, 2006 | Wood is interviewed by Lieutenant Eugene Clark. Wood said he did not ask Chaplain Petersen to contact Davis. It was noted in the investigation that "Wood was baffled about the questioning and wanted to know if religious coordinators were supposed to keep conversations private." Wood stated that he was not obsessed with Officer Davis but was platonically attracted to her. He admitted discussing with Petersen the topics of marriage to Davis and his relationship with Davis. (Defendants' In Camera Exhibits B0001.pdf.) |
| April 3, 2006 | Lieutenant Eugene Clark prepared an Investigation Report concerning the allegation of "Mr. Petersen's inappropriate conduct, by his involvement in a situation between an offender and another IDOC staff member." (Defendants' In Camera Exhibits B0001.pdf.) |
| | Petersen said that, on his own volition, he called and emailed Davis to determine if anything was going on between Wood and Davis, but Davis was upset by the contacts and answered "yes" when Petersen asked if she wanted him to steer Wood away from the feelings he had for her. Petersen said he had been in similar situations with inmates and was just trying to figure out if there was a way to help Wood be focused on his spirituality, rather than a woman. (Defendants' In Camera Exhibits B0001.pdf.) |
| | Petersen said that when new offenders come into the chapel, he has a tendency to hear them out, because it draws them closer to chapel ideals. He said that even though this part turned out sour, he |

otherwise saw a lot of growth in Wood. (Defendants' In Camera Exhibits B0001.pdf.)

April 14, 2006    An e-mail from Correctional Officer Mike Ludlow's IDOC computer email account was sent to Officer Cheryl Davis at 7:25 a.m. The email stated: "why is Davis . .going". (Defendants' In Camera Exhibits B0001.pdf.)

May 2 & 8, 2006    Supervisory prison staff generate correspondence stating a belief that an additional investigation is necessary and directing additional investigation to be completed. (Defendants' In Camera Exhibits B0001.pdf.)

May 11, 2006    Defendants Keith Yordy had Lieutenant Higgins issue a written memorandum to Wood, temporarily suspending Wood from his work assignments in the prison chapel and in the Life Transitions Program due to the staff investigation of Chaplain Les Petersen. (Dkt. 78-5, Yordy Aff., ¶¶ 4-5.)

May 15, 2006    Several internal e-mails discussing Inmate B's letter to Les Petersen are sent. Prison staff are concerned that Inmate B's letter called Petersen by his first name, and that Inmate B had information about problems involving Petersen, Cosmo Zimik (another chaplain), and a chapel volunteer. This was information Inmate B would not have known unless one of the chapel staff had discussed it with him. The conclusion was, "I believe this type of behavior ties in with Les' other issues we are looking into." (Defendants' In Camera Exhibits B0001.pdf.)

May 15, 2006    Wood files an Offender Concern Form to Deputy Warden Yordy stating that the two had discussed lifting the restriction so that Wood could attend church on Sunday from 2:00 to 4:00 p.m. and on Tuesday, from 6:00 to 9:00 p.m. The response of May 19, 2006, was, "I issued a memo yesterday." (Dkt. 82-7, p. 4.)

May 18, 2006    Defendant Yordy issues a second memorandum to Wood: "Until further notice you are approved access to the chapel at ISCI to attend religious services on Thursday nights from 7 to 9 p.m. and Sunday afternoons from 2 to 4 p.m. Other than these times, you are not to volunteer, work or otherwise be present in the chapel. If you wish to

participate in religious services outside of these times, you will need to make your request through my office." (Dkt. 82-7, p. 6.)

May 23, 2006    Wood files an Offender Concern Form to "Chaplain Cosmo/Yordy," asking to be approved for Tuesday night services when he was scheduled to preach. Yordy responds the same day, "You may attend the Tuesday night service instead of the Thursday service." (Dkt. 82-7, p. 5.)

May 23, 2006    Polygraph examination of Les Petersen is conducted. His polygraph test was interpreted as "deception indicated" when asked about whether he had contacted Cheryl Davis *at the request of Wood*. When asked if Wood pushed him to contact Davis, Petersen replied, "if he did, it was subtle." (Defendants' In Camera Exhibits B0001.pdf.)

May 24, 2006    Lieutenant Tim Higgins prepared an Investigation Report Addendum. (Defendants' In Camera Exhibits B0001.pdf.)

During the investigation, Inmate C told Higgins that Wood told Inmate C that Officer Sandra Taylor-Martin and Officer Cheryl Davis were both in love with Wood, and that Wood said he planned to get all kinds of money from the state for these relationships. Inmate C said it was a big scam and he could prove it. (Defendants' In Camera Exhibits B0001.pdf.)

May 24, 2006    Wood prepared an Offender Concern Form, stating that he was refused entrance to, and escorted away from, the chapel on this date, causing him embarrassment and emotional distress. Correctional Officer Auwen told Wood that he could not go into the chapel for any reason, including church services. Wood also states that, even though he was ordered not to have any contact with Officer Ludlow, he finds that Ludlow has direct contact with him four or five nights a week. Lieutenant Higgins responded by stating: "Temporarily suspending you from duty with pay was done in order to protect the integrity of an ongoing staff investigation. It was not punitive nor retaliatory in nature. This restriction will be lifted as soon as possible. I apologize for any inconvenience this may have caused." (Dkt. 82-8.)

| | |
|---|---|
| June 26, 2006 | Officer Ludlow took a polygraph examination. Ludlow denied having sent the email and declared under oath that he was not reprimanded after the investigation. However, the investigation raised questions about whether Ludlow had done so to help Wood. Ludlow repeatedly denied helping Wood collect information about Davis. (Defendants' In Camera Exhibits B0001.pdf.) |
| July 25, 2006 | The internal investigation of Les Petersen is concluded, and formal letter of reprimand issued to Petersen. |
| early 2007 | Les Petersen and Cosmo Zimik were working as chaplains in the ISCI chapel. They had frequent disagreements that were known to Wood. (Nelson Affidavit, Dkt. 78-3, ¶ 2; Complaint, Dkt. 82-23, ¶ ¶ 145-49.) Wood alleges that Defendant Petersen asked Wood to implicate Mr. Zimik in a wrong act, and that Petersen said Zimik "wasn't a man of God, that he was a demon, and that [Petersen] had enough to bring down [Zimik's] evil empire if he wasn't careful." (Complaint, Dkt. 82-23, ¶ 152.) In addition, during the same time period, Deputy Warden of Operations Nelson's inquiry into the incident revealed: (1) Wood was involved in the conflict between Petersen and Zimik; (2) Petersen had been reprimanded for contacting Davis, with whom Wood claimed to be having a relationship; (3) other inmates had complained that Wood was attempting to involve them in the problems between Petersen and Zimik; and (4) other inmates reported that Wood was monopolizing and attempting to control chapel programs and had "free reign" in the chapel. (Nelson Aff., Dkt. 78-3, ¶ 2.) |
| Feb. 1, 2007 | Steve Nelson directed Chaplain Cosmo Zimik to issue a third memorandum of February 1, 2007, to Wood: "This is with reference to Inmate Wood, #31919, that per D.W. Steve Nelson, he is allowed to come to Chapel only on Saturday from 0900 - 1100 hrs. to get spiritual counseling with Chaplain and or Christian clergy starting immediately for 6 months unless otherwise changes suggested from D.W. Nelson." (Dkt. 82-10, p. 2.) |
| Feb. 2, 2007 | Wood prepared an Offender Concern Form complaining about the new restrictions. Nelson replied: "We operate the chapel program that contains multiple components to meet the spiritual and social needs of inmates. Creating two chapels based on the inmate's preference, personality conflicts, observed inmate behavior, etc., in a |

manner that divides staff is not acceptable. This will allow the opportunity for more animosity and divisiveness in the program which is contrary to the purpose of the chapel program. Allowing you to meet with Cosmo Zimik individually assists in fulfilling your spiritual needs without the risk of disrupting other inmates participating in chapel and fostering/creating hostility towards certain staff." (Dkt. 82-10, p. 4; Dkt. 78-3, Nelson Aff., ¶ 5.)

Feb. 8, 2007        Wood filed a Grievance about his restrictions from the chapel. Nelson responded: "You have been allowed individual spiritual counseling. It is in the best interest of the facility to limit interference with the chapel program. This will be re-evaluated once the restriction has been lifted." (Dkt. 78-3, Nelson Aff., ¶ 6.)

Feb. 24, 2007       Division of Prisons Contact Sheet: "C/O Ludlow reports via phone that he confiscated prescription meds and a 'petition' with other offenders' signatures on it. Offender returned to unit before this info - no preemptive search possible. Seen speaking anxiously with Offender Webb 74908. C/O Ludlow said a report with more info to follow." (Defendants' In Camera Exhibits C0001.pdf.)

Feb. 28, 2007       Officer Ludlow made the following report for the incident of February 24, 2007. "Officer Ludlow noticed Offender Wood walking around to other offenders in Medical C C. I decided to observe what the offender was doing until service movement and then I would call him on his actions. At 13:25 I observed Ofc. Nuttal to Medical C. He arrived at 13:27. At 13:28 I called Offender Wood to the Officers Station. when Service Movement was called I stood up to speak with Offender Wood. I then noticed him toss a piece of tissue in the window seal nearest the Officers Station. I searched the tissue while Ofc. Nuttal and Offender Wood watched. I then found 3 pills in the tissue and Offender Wood immediately stated that the did not throw the tissue. I immediately called Sgt. Sidwell and advised him what had occurred. I then handed the pills to The Pharmacist and she identified them as 3 (Ultram) Pills. I then secured the pills and logged them into evidence. Pharmacist confirmed that he is prescribed Ultram 3 times a day (Am. 13:00, and Pm)." (Defendants' In Camera E0001.pdf.)

March 21, 2007      Wood was found guilty of the DOR written by Ludlow about the pill call incident. (Dkt. 78-4, p. 7.)

**MEMORANDUM DECISION AND ORDER - 14**

| March 29, 2007 | Wood appealed the DOR guilty finding. Warden Randy Blades dismissed the DOR: "There is a technicality. Officer Nuttal is listed as the primary witness, yet denies seeing it happen." (Dkt. 78-4, p. 9). |
|---|---|
| April 16, 2007 | The grievance appeal is granted by Warden Randy Blades on April 16, 2007: "I read the memo for the first time today 4-16-07: I rescinded the memo. You may attend chapel services." Wood's restriction lasted from February 1, 2007 to April 16, 2007. During that time, Deputy Warden of Operations Nelson observed: "Offender Wood was restricted from entering the Chapel except on Saturdays from 9:00 a.m. to 11:00 a.m. for individual spiritual counseling sessions. Complaints about Offender Wood's monopolization of the chapel and chapel programs ceased and he was no longer able to further the conflict between Chaplain Petersen and Chaplain Zimik." (Dkt. 78-3, ¶ 7.) Wood admits receiving his weekly spiritual counseling with the chaplain but states he was not able to attend any worship services during this time period. (Dkt. 78-6, Wood Aff. p. 102.) |

## DISCUSSION

1. **First Claim**

Wood alleges that Defendants Keith Yordy and Steve Nelson issued a written memorandum to Wood on May 11, 2006, temporarily suspending Wood from his work assignments in the prison chapel and in the Life Transitions Program for reasons of harassment, retaliation, and intimidation, rather than due to the staff investigation of Chaplain Les Petersen, as Defendants assert.

It is undisputed that the text of that memo read:

Due to an ongoing staff investigation, effective immediately you are suspended from your work assignment in the Chapel and with the Life Transition Team. You will continue to receive wages each month in the amount equal to your average pay over the past six months from the Idaho Department of Correction. You are hereby given a lawful order to limit your

**MEMORANDUM DECISION AND ORDER - 15**

contact with staff to security issues and living conditions at the Idaho State Correctional Institution. You are to have no contact directly or indirectly with Les Petersen and/or Officer Michael Ludlow. This temporary restriction will be lifted as soon as possible. Thank you for your cooperation in this matter.

(Dkt. 82-4, p. 2.)

### A.    *Eighth Amendment Calculated Harassment*

"Intentional harassment of even the most hardened criminals cannot be tolerated by a civilized society." *Hudson v. Palmer*, 468 U.S. 517, 528 (1984). The Eighth Amendment protects prisoners against calculated harassment. *Id*. at 530.

Courts have construed the term "calculated harassment" to require "a pattern of harassment," *Bolar v. State (O'Connor)*, No. CY-92-3071-JBH, 1993 WL 113280, at *5 (E.D. Wash. 1993), more than "a single incident," *Vigliotto v. Terry*, 873 F.2d 1201, 1203 (9th Cir. 1989) (citing *Hudson v. Palmer* and *Whitley v. Albers*, 475 U.S. 312 (1986)), and more than "two cell searches in a week," *Theodore v. Coughlin*, No. 83-CIV-6668 (LLS), 1986 WL 11456 , at *2 (S.D.N.Y. 1986).

An Eighth Amendment claim includes both an objective component, whether the deprivation of a basic human need is sufficiently serious, and a subjective component, whether the officials acted with a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective component is contextual and responsive to "'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component is derived from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *See Farmer v. Brennan*,

**MEMORANDUM DECISION AND ORDER - 16**

511 U.S. 825, 834 (1994) (quoting *Wilson*, 501 U.S. at 297 (internal quotation marks, emphasis, and citations omitted)).

Wood argues that Defendants' motion "offers no evidence to support their fraudulent claims that Wood was banned from the chapel and Life Transitions for investigative and security purposes." (Response, Dkt. 82, p. 2.) He alleges that "the May 11, 2006 investigation was fabricated to justify defendants' retaliation, harassment, and intimidation." (*Id.*, p. 3.) Wood relies on an attorney's mistake in Defendants' Statement of Undisputed Facts, showing an investigation completion date of April 25, 2006, rather than Defendant Yordy's affidavit, showing an end date of July 26, 2006. (See Reply, Dkt. 83, p. 3.) Defendants have come forward with undisputed evidence to show that a prison investigation into why Les Petersen contacted Correctional Officer Cheryl Davis was, indeed, ongoing beyond May 11, 2006. For example, the polygraph examination of Les Petersen took place on May 23, 2006, and, during the investigation, another inmate accused Wood of lying about Cheryl Davis to get gain on May 24, 2006. The polygraph examination of Les Petersen took place on May 25, 2006.

Defendants have also proffered sufficient evidence to show that a legitimate security reason supported the temporary work restrictions. Wood has not come forward with sufficient evidence supporting the required subjective element of recklessness or intentionality in the issuance of the May 11, 2006 memo. Particularly, Wood had admitted to having a relationship with Davis. Wood told Petersen that he had a relationship with Davis and that Davis was supposed to be his wife. Petersen had contacted Davis multiple

**MEMORANDUM DECISION AND ORDER - 17**

times. Defendant Deputy Warden of Security Nelson declares in his Affidavit that, "to protect the integrity of the ongoing investigation into Chaplain Petersen, it was decided by ISCI management and me that it was best to temporarily prohibit Chaplain Petersen and Offender Wood from communicating or being together." (Dkt. 78-5. ¶ 4.)

Many security interests are at stake with this set of circumstances that warranted an investigation, including whether prison staff was breaking prison rules to aid a prisoner; whether prison staff was breaking prison rules by having a romantic relationship with a prisoner; and whether a prisoner was manipulating staff, either subtly or overtly, to aid him. Defendants have brought forward sufficient evidence to show that the investigation was warranted, and that it was ongoing at the time the memorandum was issued. There is insufficient evidence in the record that the memo was issued for any other reason. Finally, Wood has failed to show that the deprivation was sufficiently serious to amount to an Eighth Amendment claim. Therefore, Wood's Eighth Amendment calculated harassment claim is subject to summary judgment.[5]

## B.     *First Amendment Free Exercise of Religion*

The Free Exercise Clause of the First Amendment absolutely protects the right to believe in a religion; it does not absolutely protect all conduct associated with a religion. *Cantwell v. Connecticut*, 310 U.S. 296 (1940). Inmates retain their free exercise rights in

---

[5] Keith Yordy was a defendant in the Sandra Taylor-Martin lawsuit, and, thus, the Court's conclusion does not hinge on the issue of retaliatory motive, which is an issue of disputed fact. Instead, because a legitimate penological interest existed for the alleged retaliatory actions, Wood's claim fails.

prison. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, challenges to

prison restrictions that are alleged "to inhibit First Amendment interests must be analyzed

in terms of the legitimate policies and goals of the corrections system, to whose custody

and care the prisoner has been committed in accordance with due process of law." *Jones*

*v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 125 (1977) (internal quotation marks

omitted).

The standards governing First Amendment claims of incarcerated citizens were

outlined by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987).

There, the Court examined a free speech issue in the context of prison officials

prohibiting correspondence between inmates residing at different state institutions. The

Court held that "when a prison regulation impinges on inmates' constitutional rights, the

regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S.

at 89. The Court identified four factors to balance when determining whether a regulation

is reasonably related to legitimate penological interests: (1) whether there is a "rational

connection between the prison regulation and the legitimate governmental interest put

forward to justify it"; (2) whether "there are alternative means of exercising the right that

remain open to prison inmates"; (3) what "impact accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison

resources generally"; and (4) whether "ready alternatives" exist. 482 U.S. at 89-90 (The

"existence of obvious, easy alternatives may be evidence that the regulation is not

reasonable, but is an 'exaggerated response' to prison concerns.").

**MEMORANDUM DECISION AND ORDER - 19**

Based on the facts set forth in Section 1(A), above, Defendants have provided sufficient evidence to show that the first factor is met: there was a rational connection between the temporary work suspension and the need to protect the integrity of the Les Petersen investigation into the incidents involving Petersen, Wood, and Davis. The second factor is met because what was restricted was *work*, not *worship*. There is no constitutional right to do paid or volunteer work in prison, and Wood's right to worship was left open (but for the temporary misinterpretation of the non-defendant officer). The third factor also weighs in favor of Defendants, because permitting Wood to breach the integrity of the prisoner investigation had broad negative implications for the security of the prison and the ability of prison staff to investigate prison problems. The fourth factor also favors Defendants, because limiting Wood's work was not an exaggerated response to the prison concern of protecting the integrity of the investigation. Therefore, under the applicable *Turner* factors, Wood's free exercise claim fails.

## C. RLUIPA

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000 cc- 1(a).

**MEMORANDUM DECISION AND ORDER - 20**

Here, the precise question under the law is whether Wood has any remedies available under RLUIPA, given that the claim is grounded not an ongoing circumstance, but on a temporary situation that has since been remedied. It appears that, under the current state of the law, RLUIPA has been interpreted as a statute that does not provide for monetary damages. In *Sossamon v. Texas*, 131 S.Ct. 1651, 1663 (2011), the United States Supreme Court held that RLUIPA does not provide for damages against state defendants in their *official* capacities.

Further, many United States Courts of Appeal have concluded that RLUIPA does not create a cause of action for damages against officials in their *individual* capacities, although the United States Court of Appeals for the Ninth Circuit has not yet addressed the issue. *See Rendelman v. Rouse*, 569 F.3d 182, 187–89 (4th Cir. 2009); *Nelson v. Miller*, 570 F.3d 868, 886–89 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1271–75 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S.Ct. 1651 (2011). In so concluding, the courts reasoned that Congress enacted RLUIPA pursuant to the Spending Clause and did not indicate with sufficient clarity an intent to condition the states' receipt of federal funds on the creation of an individual capacity action for damages; moreover, a contrary reading of the statute would raise serious constitutional concerns about the extent of Congress's authority under the Spending Clause. *See Rendelman*, 569 F.3d at 187–89; *Nelson*, 570 F.3d at 887–89; *Smith*, 502 F.3d at 1271–75.

Furthermore, several United States District Courts in the Ninth Circuit have

concluded that RLUIPA does not create a damage claim against officials in their individual capacities. *See, e.g., Rupe v. Cate*, 688 F.Supp.2d 1035, 1044–46 (E.D. Cal. 2010); *Hundal v. Lackner*, 2009 WL 2985448, *4 (C.D. Cal., September 15, 2009). The Court adopts the reasoning of the Fourth, Seventh, and Eleventh Circuits and concludes that Wood cannot assert an RLUIPA claim for damages against defendants in their individual capacities.

A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426, 431 (1948). "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985).

Wood's claims for injunctive and declaratory relief are moot because Wood complains of specific instances of past conduct that no longer exist. Here, no purpose would be served by issuing a declaration where a controversy no longer exists.

### D.     *Fourteenth Amendment Equal Protection*

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). However, "[t]he Constitution does not require things which are different in

fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

Wood has provided insufficient evidence of a discriminatory intent, such that a strict scrutiny analysis would apply. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1952 (2009) (to avoid dismissal, Wood must allege facts showing or intimating discrimination because of race, religion, or national origin).

Neither has Wood provided sufficient facts under which he could proceed to a jury trial on a rational basis theory. Under a rational basis inquiry, in order to state an equal protection claim, Wood must bring forward facts alleging that he is similarly situated to others and is being treated in a disparate manner, and that there is no rational basis for the disparate treatment. *More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993). Here, a legitimate reason existed for issuance of a temporary suspension of Wood's work duties in the chapel and in the Life Transitions Program, and, thus, Wood has not come forward with sufficient facts showing he is similarly situated to others or, that, if he were treated differently, there was not a rational basis for the treatment, which was the necessity of a investigation into the relationship among Wood, Cheryl Davis, and Chaplain Petersen for prison security reasons.

### E. *First Amendment Retaliation*

A retaliation claim must allege the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment

rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of arbitrary retaliation" are insufficient to state a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985). "A prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam); *see also Turner v. Safley*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). While "timing can be properly considered as circumstantial evidence of retaliatory intent," there must generally be something more than simply timing to support an inference of retaliatory intent. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

Here, Wood fails to show that the action did not reasonably advance a legitimate correctional goal. As noted above, several different reasons existed for prison officials to temporarily suspend Wood from his work while the investigation was being completed, to avoid compromising the investigation results. Accordingly, this claim is subject to summary judgment.

**F.     First/Fourteenth Amendment Access to Courts**

An inmate has a constitutional right to access the courts, *Bounds v. Smith*, 430 U.S. 817 (1977), and may recover for denial of that right in a civil rights lawsuit if he or she can demonstrate that an actual injury occurred as a result of the alleged denial, meaning that "a nonfrivolous legal claim has been frustrated or was being impeded." *Lewis v. Casey*, 518 U.S. 343, 352-53 (1996). In *Lewis v. Casey*, the United States Supreme Court clarified that the right to access the courts is a limited one, aimed at ensuring that prisoners may initiate their legitimate petitions and complaints, and that the federal courts should not require the state to provide legal materials to prisoners which exceed the scope of that right. *See id.* at 354.

The United States Court of Appeals for the Ninth Circuit has held that "[t]here is no legitimate claim of entitlement to a [jail] grievance procedure" under the First Amendment. *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988), *cert. denied*, 488 U.S. 898 (1988). However, the Ninth Circuit has also held that "the right of meaningful access to the courts extends to established jail grievance procedures." *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n. 2 (2001)). However, in order to pursue a claim that prison officials interfered with or prevented an inmate's grievance from being processed, an inmate must adequately allege that he suffered an actual injury in being able to access the courts. *See Lewis v. Casey*, 518 U.S. 343, 348 (1996).

Here, Wood has failed to come forward with sufficient evidence to show that the May 11, 2006 temporary suspension of his work duties with pay amounts to any type of access to courts violation. This claim is subject to summary judgment.

## 2.    Second Claim

The second claim arises from Defendant Yordy's issuance of a May 18, 2006 memorandum attempting to clarify that the May 11, 2006 memorandum did not bar Wood from attending religious services, but rather only temporarily suspended him from work assignments. The text of that memo was:

> "Until further notice you ar approved access to the chapel at ISCI to attend religious services on Thursday nights from 7 to 9 p.m. and Sunday afternoons from 2 to 4 p.m. Other than these times, you are not to volunteer, work or otherwise be present in the chapel. If you wish to participate in religious services outside of these times, you will need to make your request through my office."

(Dkt. 82-7, p. 6.) Wood alleges that this action continued to violate his civil rights.

### A.    *Eighth Amendment Calculated Harassment*

As noted directly above, the undisputed evidence in the record shows that the investigation into Les Petersen, Cheryl Davis, and Wood was still ongoing at the time the second memorandum was issued. The memorandum clearly was issued to protect Wood's right to attend worship services, not to curtail his right, permitting him to attend the two worship services that he himself designated. (Yordy Affidavit, Dkt. 78-5, ¶¶ 6-7.) Therefore, Wood has not that Defendants had an improper motive. Further, there is insufficient evidence in the record that the memo was issued for any reason other

**MEMORANDUM DECISION AND ORDER - 26**

than to permit Wood to worship while the investigation was ongoing. Therefore, Wood's claim is subject to summary judgment.

**B.    *First Amendment Free Exercise of Religion***

As addressed above, the first memo issued by Higgins, under the direction of Yordy, prohibited Wood from doing his paid work in the chapel and his volunteer work in the Life Transitions Program, but it did not, on its face, restrict Wood's worship. In contrast, the clarifying memo sent by Yordy after Officer Auwen misinterpreted the memo as not allowing Wood to attend any worship services, provided for Wood to worship only during certain times in the chapel. In effect, Wood was prohibited from worshiping in the chapel at any time other than the times specified in the memo. It is undisputed that, prior to issuing the memo, Defendant Yordy met with Wood so that Wood could tell him which services he wished to attend. Defendant Yordy included those services in the memo. In addition, Yordy included in the memo the statement that Wood could change his worship times by contacting Yordy. Wood did so, and the Thursday worship was changed to Tuesday. (Yordy Affidavit, Dkt. 78-5, ¶¶ 6-7.)

Wood's First Amendment free exercise claim fails on many grounds. First, to serve as a basis for a viable claim challenging a prison restriction under the Free Exercise Clause, an inmate's belief must be both sincerely held and rooted in religious belief. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). A burden on the exercise of religion is substantial if it substantially pressures an inmate "to modify his behavior and to violate his [sincerely held religious]

beliefs." Shakur, 514 F.3d at 888. Wood does not dispute that Yordy met with him and permitted him to pick the most important worship services he would like to attend, and that Wood, was, in fact, permitted to attend those services.

Wood has not alleged sufficient facts showing what his sincere religious beliefs are, or how they were substantially burdened. Wood mentioned to Petersen that Wood believed Davis was to be his "eternal" wife, pursuant to his LDS beliefs. However, chapel attendance records from 2006 show that Wood rarely attended LDS services. (Dkt. 82-21.) The vast majority of Wood's chapel attendance shows "Chapel Hospice Program," which is associated with his volunteer work. Wood has not brought forward facts showing that lack of attendance at the Chapel Hospice Program substantially burdened a sincerely-held religious belief, not simply that it burdened his volunteer work. (*Id*.) The record shows that a large part of Wood's time at the chapel was for activities not necessarily connected to his own personal worship, including: work as a janitor, work as a chapel librarian, work as an office clerk at his own desk, volunteer work as a preacher or teacher of faith-based education classes, volunteer work in the hospice program, facilitator work for college courses, volunteer trainee work as a chapel sound technician, fraternizing with the chaplains, and socializing with other Christian inmates. (Dkt. 82-23, ¶ ¶ 18-19.)

In addition, Defendants have come forward with sufficient evidence to show that the temporary restriction on Wood's religious practice was reasonably related to legitimate penological interests, because of the need for the ongoing investigation.

**MEMORANDUM DECISION AND ORDER - 28**

Because the memo (1) was focused on permitting worship, rather than non-religious or non-essential religious activities and meetings, (2) was based on Wood's own requests to attend particular services, and (3) was open to be modified at Wood's request, and was in fact later modified as a result of Wood's request, it was not unduly restrictive. Wood was given alternative means of exercising his right to worship, accommodating Wood's desire to be in the chapel for all of his no-worship activities would have negatively impacted the investigation, and no ready alternatives existed to both permit Wood free reign of the chapel and preserve the integrity of the Les Petersen investigation.

In addition, Wood has failed to bring forward sufficient evidence showing that Defendants recklessly or purposefully prevented Wood from worshiping, when the memo was created for the purpose of clarifying to other staff that Wood could attend the essential worship services of his choice, reasonably restricted for investigative purposes. This claim is subject to summary judgment.

### C.    *RLUIPA*

The RLUIPA claim fails for the same reasons specified in Section 1(c), above.

### D.    *Fourteenth Amendment Equal Protection*

The Equal Protection claim fails for the same reasons specified in Section 1(D), above.

### E.    *First Amendment Retaliation*

The retaliation claim fails because prison officials had a legitimate penological reason for restricting Wood from spending excessive amounts of time in the chapel area,

**MEMORANDUM DECISION AND ORDER - 29**

where the investigation centered, during the time period when the investigation was ongoing, as specified in Section 1(E), above.

**F.**    *First/Fourteenth Amendment Access to Courts*

Here, Wood has failed to come forward with sufficient evidence to show that the May 18, 2006 clarifying memorandum permitting him access to the two religious services of his choice amounts to any type of access to courts violation. This claim is subject to summary judgment.

**3.    Third Claim**

Wood's third claim is centered on a third memorandum of February 1, 2007, from Steve Nelson and Cosmo Zimik to Wood. The content of the memo was:

> "This is with reference to Inmate Wood, #31919, that per D.W. Steve Nelson, he is allowed to come to Chapel only on Saturday from 0900 - 1100 hrs. to get spiritual counseling with Chaplain and or Christian clergy starting immediately for 6 months unless otherwise changes suggested from D.W. Nelson."

(Dkt. 82-10, p. 2.)

This memo was in place from February 1, 2007, until April 16, 2007, when Wood's grievance appeal was granted by Warden Randy Blades, and he was again permitted to attend chapel services.

**A.**    *Eighth Amendment Calculated Harassment*

At the beginning of 2007, Deputy Warden of Operations Nelson began conducting an investigation into problems existing between two chaplains, Petersen and Zimik.

Nelson began to discover that Wood appeared to be a factor or cause of a large number of problems in the chapel, including problems between staff, problems between staff and management, problems between Wood and staff, problems between Wood and other inmates, and problems between staff and other inmates. This finding is consistent with Wood's history of "crossing the line" in his involvement with staff,[6] and the repercussions of his decisions to do so. Wood's own Complaint details the vast number of chapel duties and programs he participated in,[7] the conversations staff held with him that should not have been shared between staff and inmates,[8] and, in short, the great control Wood had in the chapel. Recognizing these issues as security issues that affected many inmates and staff and held the potential to affect the entire institution, Nelson and other management tried to determine a way to shield the chapel from Wood for a period of time while balancing the right of Wood to worship. They decided that permitting Wood unrestricted worship in his cell and worshiping once a week, not in a service or fellowship setting, but with personal spiritual counseling from Chaplain Zimik in the

---

[6] See Wood Deposition in Case No. 3:04-cv-00099-WBS, Dkt. 279-6, p. 6.

[7] See Section 2(B), above.

[8] Wood's Complaint alleges: "Plaintiff told defendant Petersen that Warden Blades had ordered that he was to get everything back and this included head of Life Transition," and "Defendant Petersen told Plaintiff that what they tell you is the opposite of what they tell us." (Dkt. 82-23, ¶¶ 128-29.) In addition, the Complaint alleges: "Defendant Petersen told Plaintiff that defendant Yordy didn't like him, and didn't want him working at the chapel or on Life Transition." (Id., ¶ 133.) The Complaint further alleges: "Defendant Petersen asked Plaintiff to implicate Mr. Zimik in a wrong act so that he could show the Warden that Zimik wasn't a man of God, that he was a demon, and that [Petersen] had enough to bring down his evil empire if he wasn't careful." (Id., ¶ 152.)

MEMORANDUM DECISION AND ORDER - 31

chapel, would meet Wood's religious needs. The memo specifically set the temporary time limit for this plan for six months.

Wood has failed to bring forward sufficient evidence to show that the third memo was not issued for a legitimate penological reason rather than the purpose of harassment. In fact, Nelson cited many different, but related, security reasons for restricting Wood from the chapel for six months. Nelson also observed that the chapel problems dissipated when Wood was on chapel restriction. There is insufficient evidence in the record to show that Defendants acted with a sufficiently culpable state of mind to meet the subjective element of this claim. Defendants' actions do not offend contemporary standards of decency, but instead clearly were aimed at restoring the integrity of prison security, thus, Wood cannot meet the objective component of the claim. Accordingly, Defendants are entitled to summary judgment under an Eighth Amendment calculated harassment theory.

**B.    *First Amendment Free Exercise of Religion***

To serve as a basis for a viable claim challenging a prison restriction under the Free Exercise Clause, an inmate's belief must be both sincerely held and rooted in religious belief. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). 1) Under *Turner*, a restriction on the practice of religion does not offend the Constitution where there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates";

(3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" exist. 482 U.S. at 89-90.

The first *Turner* factor, whether there is a rational connection between the prison regulation and the legitimate reason for creating the regulation weighs in favor of Defendants. The third memo that was issued was more restrictive and intended to be in place for a longer period of time than the first two memos. However, as noted above, the third memo was issued for broader reasons that were discovered during the investigation of Petersen. At that time, there were difficulties between Chaplains Petersen and Zimik. Wood references these difficulties in his Complaint. (Complaint, ¶ 146-55.)

Based on the discovery of many interrelated problems that all pointed to Wood, Deputy Warden of Operations Steve Nelson determined:

> My inquiry led me to conclude that Offender Wood posed a risk to the security of the Chapel and the institution as a whole. In addition, Offender Wood's conduct while in the chapel was interfering with the effective operations of ISCI's religious programs. Through manipulation, Offender Wood had obtained a concerning level of control over the two Chaplains and was feeding conflict among the staff. Offender Wood also gained too much influence in the Chapel and was allowed to exercise a dangerous level of autonomy while in the Chapel. His attempts to control the Chapel and Chaplains was not only a security risk, but was also impeding other offenders['] ability to fully access the Chapel and participate in religious programs. Moreover, Offender Wood's monopolization of the Chapel and Chapel library had begun to anger other offenders thus posing a potential risk of harm to Offender Wood.

(Nelson Aff., ¶ 3.)

As a result of his inquiry, Defendant Nelson took the following steps:

**MEMORANDUM DECISION AND ORDER - 33**

After discussing my inquiry with ISCI management and the Chaplains, I decided that the best course of action was to temporarily limit Offender Wood's contact with the Chaplains and his free reign of the Chapel area. Accordingly, I decided that providing Offender Wood two hours each week of supervised visits to the Chapel for six months['] time would solve the problem that Offender Wood was causing while accommodating Offender Wood's access to the ISCI Chapel. Pursuant to my direction, Chaplain Zimik, issued a memorandum on February 1, 2007, regarding Offender Wood's limited access. During the two hours he was allowed to be in the Chapel, Offender Wood would received individual spiritual counseling with the Chaplain of his choice and could access the different parts of the Chapel under the Chaplain's supervision. Offender Wood was not restricted in any way from practicing his religious beliefs outside of the Chapel. In fact, Offender Wood was allowed to have religious materials and books brought to his cell upon his request and was permitted to have one-on-one spiritual counseling with a Chaplain in his cell.

(*Id.*, ¶ 4.)

Prior to issuance of the third memo, Wood was employed as an ISCI janitor. He also worked in the chapel as a librarian, and office clerk, and he was training to be a soundboard technician. (Complaint, ¶ ¶ 18-19.) He had his own desk in the chapel. (*Id.*) He facilitated faith-based educational classes, preached at monthly services, co-facilitated a college course, and headed the Life Transitions hospice program. (*Id.*) This is ample evidence supporting Defendants' concern that Wood monopolized the chapel or had "free reign" of the chapel and the Life Transitions area, which contributed to the staff-to-staff problems, staff-to-management problems, staff-to-inmate problems, and inmate-to-inmate problems.

The second *Turner* factor also weighs in favor of Defendants, who created an

alternative way for Wood to worship. He was not prohibited from worshiping in his cell, and he was permitted to worship or have spiritual counseling once a week with a chaplain. He could also request unlimited visits from the chaplain in his cell. Wood has not provided any specific facts showing what his worship required or how these temporary alternatives did not meet his essential spiritual needs.

The third *Turner* factor also weighs in favor of Defendants. If Nelson accommodated Wood's desire to return to the chapel immediately, then Nelson would not have been able to address and correct the problems between the chaplains, the problems among the chaplains and prison management, the problems among the chaplains and Wood, the problems among the chaplains and other inmates arising from Wood's heavy use of the chapel and Life Transitions Program, and the problems among other inmates and Wood. Accommodation, in other words, would have negatively affected staff, management, other inmates, and the overall security of the prison.

Fourth, the final *Turner* factor (whether the prison response was exaggerated) weighs in favor of Defendants, though not as heavily as the other factors. While Wood could have been permitted to go to a few, but not all, chapel services, the other inmates attending those services would not have been served at all. The premise behind banning Wood from the chapel except for once-a-week personal worship was to address all of the problems Wood was involved with, in a wholesale manner. Wood has not shown that he could not adequately worship during his once-a-week chapel visit and in his cell (alone or with a chaplain) during this investigatory period. The large number of Wood's

**MEMORANDUM DECISION AND ORDER - 35**

inappropriate past relationships and the large number of then-current chapel difficulties pointing to Wood as a common factor warranted a broader prison response than in the initial investigation into only Petersen and Wood.

This case undoubtedly shows how a strong-willed inmate can exploit the human weaknesses of prison staff, amounting to a recipe for repeated prison problems. This combination has been a pattern for prison discord and security risks throughout Inmate Wood's incarceration, beginning with the Susan Isaac incident in 2004, and continuing to the perceived monopolization of the chapel and hospice program in 2007. To their credit, Defendants tried to set the stage for a very thorough investigation of all of the allegations surrounding Lance Wood. This has resulted in a curtailing of Wood's privileges, and sometimes his rights, but, his rights have not been curtailed to the degree that the Constitution is offended. The serious security breaches shown in the record, coupled with the balancing of Wood's right to worship, demonstrate that the four *Turner* factors weigh in favor of Defendants. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. As a result, Wood's First Amendment claim is subject to summary judgment.

### C.     *RLUIPA*

The RLUIPA claim fails for the same reasons specified in Section 1(c), above.

### D.     *Fourteenth Amendment Equal Protection*

The Equal Protection claim fails for the same reasons specified in Section 1(D),

above.

### E.    *First Amendment Retaliation*

The retaliation claim fails because prison officials had a legitimate penological

reason for restricting Wood from spending excessive amounts of time in the chapel area,

where the investigation centered, as discussed at great length under Section 4(A) and (B),

above.

### F.    *First/Fourteenth Amendment Access to Courts*

Wood has failed to come forward with sufficient evidence to show that the

February 1, 2007 memo amounted to any type of access to courts violation. This claim is

subject to summary judgment.

## 4.    Fourth Claim

Wood alleges that, on February 24, 2007, Defendant Ludlow set up Wood and

retaliated against him by planting a Kleenex containing prescription medication in a

windowsill and then wrongfully attributing that to Wood and charging him with a

Disciplinary Offense Report. (Dkt. 77, p. 10.) The adverse act was allegedly committed in

retaliation for Wood filing the earlier lawsuit against Sandra Taylor-Martin and others,

arising from Wood's incarceration at the ICIO (Orofino) prison facility.

### A.    *Eighth Amendment Calculated Harassment*

The Court previously determined that Wood was foreclosed from presented a

calculated harassment claim based on a number of incidents (a required element of

calculated harassment) because he failed to properly exhaust his claims. This theory,

**MEMORANDUM DECISION AND ORDER - 37**

therefore, does not apply to the Fourth Claim against Defendant Ludlow.

**B.    *First Amendment Free Exercise***

Wood has stated no facts against Defendant Ludlow that would amount to a First Amendment Free Exercise Clause claim.

**C.    *RLUIPA***

The RLUIPA claim fails for the same reasons specified in Section 1(C), above.

**D.    *Fourteenth Amendment Equal Protection***

The Equal Protection claim fails for the same reasons specified in Section I(D), above.

**E.    *First Amendment Retaliation***

The United States Court of Appeals for the Ninth Circuit recently addressed how a retaliation analysis should be performed in *McCollum v. California Dept. of Corr. and Rehab.*, 657 F.3d 870 (2011), in which it considered a prison chaplain's allegations that, after the prison chaplain filed a civil rights lawsuit alleging that he should be paid for being a Wiccan chaplain like the chaplains for the larger Christian and other religious groups were paid, another staff retaliated against him by making a false allegation that he had misrepresented himself as a paid prison chaplain rather than an unpaid chaplain. *McCollum* relied on *Allen v. Iranon*, 283 F.3d 1070 (9th Cir. 2002), in which a prison physician had sued prison officials for retaliating against him for speaking out about inmate abuse. While these two cases arose from prison settings, they addressed incidents where the object of retaliation was an employee; however, the reasoning appears sound

**MEMORANDUM DECISION AND ORDER - 38**

and applicable to incidents where the object of retaliation is an inmate. Thus, the Court finds the analysis instructive here, keeping in mind the restrictions an inmate may face in obtaining evidence.

In *McCollum*, the Court determined that, to raise a triable issue as to retaliatory motive, an inmate must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." 657 F.3d at 882 (quoting *Allen v. Iranon*, 283 F.3d at 1077). The three types of evidence showing motive include: "(1) proximity in time between protected speech and the alleged retaliation;[9] (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false and pretextual." *Id*. (quoting *Allen*, 283 F.3d at 1077). When it is alleged that the adverse action was taken in retaliation for the filing of a lawsuit, a plaintiff must bring forward evidence that the defendant "opposed the lawsuit," not merely that he "knew of the lawsuit." *Id*.

Chiefly at issue is whether Wood has brought forward sufficient evidence to reach the jury on the question of retaliatory intent: whether Officer Ludlow took an adverse action *because of protected conduct*. Wood has alleged several reasons that Ludlow may have manufactured the pill call incident, which the Court will review.

First, Wood alleges that Ludlow had a history of targeting litigators. However, it is

---

[9] While "timing can be properly considered as circumstantial evidence of retaliatory intent," there must generally be something more than simply timing to support an inference of retaliatory intent. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

undisputed that Ludlow had been on the job for only about nine months, and he had just finished his probationary work period. Wood has not brought forward sufficient evidence to show that this allegation is true.

Second, Wood alleges in his pleadings that Ludlow conducted a cell search and found that Wood had Officer Martin's "personal" file in his possession; Ludlow stated that he would need to bring the situation to the attention of his supervisors. Wood also alleges that Ludlow left Wood's legal files in disarray after the search. Wood does not know when this alleged cell search was conducted. (Dkt. 78-6, Wood Depo., p. 84.) Thus, the "proximity in time" factor is not met. In addition, in his deposition, Wood contrarily states that he has no knowledge that Ludlow ordered or participated in any cell searches. (*Id.*, p. 58.)

More importantly, even if Ludlow generally learned of Wood's lawsuit when Ludlow searched Wood's cell, Wood fails to bring forward sufficient evidence to show that Ludlow *opposed* Wood's lawsuit against Sandra Taylor-Martin. Wood brings forward nothing showing that Ludlow had any personal connection to Sandra Taylor-Martin or any other Defendant named in that lawsuit that might be evidence of a retaliatory motive.

Ludlow himself has declared he had no personal knowledge of Wood's lawsuit. (Dkt. 78-4, Ludlow Depo., ¶ 7.) Similarly, in Wood's deposition, Wood admitted he had no personal knowledge that Ludlow knew of Wood's underlying lawsuit at the time Ludlow allegedly filed the false DOR against Wood for the pill-call incident. (Dkt 78-6,

**MEMORANDUM DECISION AND ORDER - 40**

Wood Depo, pp. 29, 88, 108.)

In his deposition, Wood testified as follows:

Q.    I believe earlier you told me that you have no personal knowledge that
      Defendant Ludlow ever knew about your underlying lawsuit. Do you still
      contend that's the case?

A.    Well, let me put it this way: Because of the investigation, I should say, that
      was conducted into him by Higgins and him getting in trouble, probably.
      Whether he found out about my lawsuit or not later on, is he has a history of
      retaliating against people, inmates, who have filed lawsuits against the
      department, whether it be him or not so he could – and I also believe I said I
      didn't know, so I'm not – go ahead.

Q.    But your answer at this point—

A.    Yes. Yes.

(Wood Depo., pp. 106-07.)

The investigation spoken of by Wood is IDOC's investigation of why an email to

Officer Davis at ICI-O was sent from Ludlow's email account in Boise that read, "why is

Davis . .going". The email was sent on April 14, 2006, and the investigation into Ludlow

ended approximately June 26, 2006, when Ludlow took a polygraph examination. Both of

these incidents were not close in time to the pill-call incident, which occurred on February

24, 2007. In addition, there is nothing in the record showing that the email from Ludlow's

account to Davis was connected to the Sandra Taylor-Martin lawsuit, rather than to some

effort, as in the Les Petersen situation, of Ludlow to contact Davis for Wood, or,

alternatively, of Wood to use Ludlow's account to contact Davis.

In either case, it is clear from the record that *the interaction among Wood, Ludlow,*

*and Davis* caused Ludlow to "get in trouble" at work, as Wood states in his deposition. If this was Ludlow's motive for "retaliating" against Wood, it is a case of personal retaliation, not First Amendment retaliation, because no protected conduct was at issue.

If there is no protected conduct at issue, then it does not matter whether the parties currently dispute whether Ludlow waited many months to "get" Wood,[10] or "set up" Wood because Wood got Ludlow in trouble at work, or whether Wood was caught throwing the Kleenex in the windowsill to pass medication to another inmate (just as he said he used to send notes to Ms. Taylor -Martin in a pen).

Because of the lack of connection between a protected act or protected speech and the pill call incident, Wood's retaliation claim against Ludlow fails. For all of the foregoing reasons, Ludlow is entitled to summary judgment on the First/Fourteenth Amendment retaliation claim.

**F.    *First/Fourteenth Amendment Access to Courts***

Here, Wood has failed to come forward with sufficient evidence to show that the February 1, 2007 memo amounted to any type of access to courts violation. This claim is subject to summary judgment.

––––––––––––––––––––

[10] Brian Reed, the hospital janitor, alleges that Ludlow said he was going to "get" Wood; and that Ludlow said that he had confiscated a list of names from Wood that Ludlow believed were going to sue him. (This statement allegedly occurred the day of the pill incident, and so the list confiscated on same day could not be the reason for the "retaliation.") Later, Reed heard Ludlow say that he "finally got" Wood, and the other officer laugh and say, "Let's see if Wood can fight his way out of this one." (Dkt. 82-2.)

## CONCLUSION

Wood has failed to bring forward sufficient evidence supporting key elements of his remaining claims such that he should be permitted to proceed to a jury trial. Wood's other claims were dismissed as a result of failure to exhaust. Accordingly, Defendants' Motion for Summary Judgment will be granted, and Wood's case will be dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1.  Plaintiff's Motion for Extension of Time (Dkt. 96) is GRANTED, through February 28, 2012, the date he requested. However, because he filed no supplemental response by that date, and because a review of the in camera records shows that no genuine dispute of material fact is raised by the records, the Court has considered the record before it.

2.  Plaintiff's Motion for Clarification (Dkt. 99) is MOOT.

3.  Defendants' Motion for Summary Judgment (Dkt. 78) is GRANTED. Plaintiff's entire case is DISMISSED with prejudice.

DATED: **March 30, 2012**

Honorable Edward J. Lodge
U. S. District Judge